# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

MARC GRASSO,                               )        CASE NO. 1:13-cv-02634
                                           )
    Petitioner,                        )        JUDGE LESLEY WELLS
                                           )
        v.                      )        MAGISTRATE JUDGE GREG WHITE
                                           )
MAGGIE BEIGHTLER, Warden                   )
                                           )
    Respondent.                        )        **REPORT AND RECOMMENDATION**
                                           )

       Petitioner Marc Grasso ("Grasso"), challenges the constitutionality of his conviction in the case of *State v. Grasso*, Cuyahoga County Court of Common Pleas Case No. CR560184. Grasso, *pro se*, filed his Petition for a Writ of Habeas Corpus (ECF No. 1) pursuant to 28 U.S.C. § 2254 on November 26, 2013.  On January 17, 2014, Warden Maggie Beightler ("Respondent") filed her Answer/Return of Writ.  (ECF No. 6.)  Grasso filed a Traverse on February 14, 2014. (ECF No. 7.)  Respondent filed a Reply on February 25, 2014.  (ECF No. 8.)  For reasons set forth in detail below, it is recommended that Grasso's petition be DENIED.

## I.  Summary of Facts

       In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, factual determinations made by state courts are presumed correct.  28 U.S.C. § 2254(e)(1); *see also Franklin v. Bradshaw*, 695 F.3d 439, 447 (6th Cir. 2012); *Montgomery v. Bobby*, 654 F.3d 668, 701 (6th Cir. 2011).  The state appellate court summarized the facts

underlying Grasso's conviction as follows:

[*P2]  In 2012, Grasso was charged with five counts of aggravated arson and one count each of illegal manufacture of drugs, assembly or possession of chemicals for the purpose of manufacturing drugs, and drug possession. The matter proceeded to a bench trial, at which the following pertinent evidence was presented.

[*P3]  Grasso lived with his girlfriend, codefendant Candace Needs,n1 in the basement of a Maple Heights home. The house was owned by Needs's grandparents, James Hargrove and Juanita Zicarelli. Hargrove was 93 years old at the time of the incident, confined to a wheelchair, and needed oxygen to facilitate his breathing. Zicarelli used oxygen at night. They lived on the main floor of the house with their son, Rick Faucett.

> Footnote 1:  Needs pleaded guilty to an amended indictment and was sentenced to a total of eight years in prison. *See State v. Needs*, Cuyahoga C.P. No. CR-560184-B.

[*P4]  The basement was equipped with a bedroom, bathroom, and kitchen. Neither of the grandparents ever went into the basement; Needs would do her grandparents' laundry for them and bring it upstairs so they did not have to go downstairs.

[*P5]  On February 23, 2012, Grasso and Needs were in the basement with a friend, Nicole Kubinski. The grandparents and Faucett were also home. There was an explosion in the basement and the house caught on fire. All six people in the home were able to escape. Grasso suffered burns on his hands and Needs sought medical attention for burns to the trunk of her body and foot.

[*P6]  The entire Maple Heights Fire Department ("M.H.F.D.") responded to the fire. Members of the Maple Heights Police Department and the Bedford Fire Department also responded. M.H.F.D. Lieutenant Vytautas Kavaliunas testified he arrived on the scene and noted smoke coming from the side door of the house, which led to the basement. Black smoke was pouring out of the eaves of the roof and there was heavy smoke in the first floor of the home.

[*P7]  Lieutenant Kavaliunas testified that the fire originated in the basement, which made the fire "inherently dangerous" because of the lack of ventilation. According to Lieutenant Kavaliunas, he would expect that anyone in the basement at the time of the fire would suffer burns and damage to the face and nose from smoke inhalation. He further testified that it would only take a breath or two for someone in the home at the time of the fire to succumb to the effects of the carbon monoxide; the potential harm to a person with breathing difficulties

was even greater.

[*P8]  The firefighters noted that the stairwell going into the basement was extensively burned and the fire had accelerated into the first floor of the home and up into the attic. Lieutenant Kavaliunas testified he first became suspicious of the cause of the fire when he noticed that it appeared to originate in two different areas of the basement – in the kitchen and near a bed. The M.H.F.D. contacted the State Fire Marshal's office to investigate.

[*P9]  Brian Peterman, a state fire marshal, responded to the scene the next morning and immediately noticed several items in the basement that, to him, were indicative of a methamphetamine lab, or "meth" lab. He opined that the fire started when someone was making, or "cooking," methamphetamine.

[*P10]  Peterman agreed that the fire originated in two places. He testified that someone tried to carry the container being used to make the drug into another area of the basement, which is how the second fire started, catching the mattress on fire. This movement of the container, according to Peterman, would burn a person's hands.

[*P11]  Peterman opined that the fire was not an accident, because people who manufacture methamphetamine know they are creating a hazard that can cause fire.

[*P12]  Peterman further testified that there was no evidence the fire was caused by cooking food, the production of methamphetamine is very toxic, and the fire could have totally destroyed the house if the fire department had not responded so quickly.

[*P13]  Southeast Area Law Enforcement Bureau's ("SEALE") Detective Bill Gall secured a search warrant for the premises and arrived on the scene to collect evidence. Detective Gall took pictures and set about collecting evidence that, in his experience, is used to make methamphetamine. He observed and collected a melted plastic filter, coffee filters, glass jars, a measuring cup, a respirator, several plastic two-liter bottles, various paraphernalia used to ingest drugs, a can of Coleman fuel, plastic baggies, plastic tubing, a tourniquet, multiple packs of lithium batteries, multiple syringes, a can of acetone, containers of drain cleaner, light bulbs modified into smoking devices, a digital scale, aluminum foil, and packets of cold medicine.

[*P14]  Detective Gall also recovered various items from the garage: several plastic bottles with tubing and waste product leftover from methamphetamine production, empty packs of pseudoephedrine, store receipts, coffee filters, plastic tubing, an envelope addressed to Grasso that contained spent lithium battery

-3-

strips, and an empty Coleman fuel can.

[*P15]  Detective Gall testified that he recovered residue in some of the plastic baggies and suspected it was end-product methamphetamine. He field-tested the residue; the test came back positive for methamphetamine. He forwarded the baggies and additional objects for testing to the Ohio Bureau of Criminal Investigation ("BCI").  He then collected as much evidence as was safe but packaged the rest for destruction due to the hazardous nature of the material.

[*P16]  BCI special agent Gary Miller testified for the state as an expert in methamphetamine production. He opined that the methamphetamine process that caused the fire was the "one-pot" method, in which a single container is used. He identified other ingredients found in the basement and garage that are used to make methamphetamine: pseudoephedrine, cold packs, drain cleaner, acetone or fuel, and lithium batteries.

[*P17]  Miller explained the chemical process by which the drug is made. He described the bottles depicted in the photographs of the crime scene and explained how they were used as gas generators as part of the cooking process. Miller testified that one of the two-liter bottles showed residue from the cooking process, evidencing that methamphetamine had been produced at a previous time at this location.

[*P18]  Miller testified that a user can use methamphetamine by smoking, snorting, eating, or injecting the drug. If smoked, meth is usually smoked using a glass pipe, modified light bulbs or "foil canoes," such as those the police found in the basement of the Maple Heights house.  If the user is injecting the drug, he or she would use a syringe and a "tie-off" or tourniquet, like that which was found in the basement.

[*P19]  Miller explained that because pseudoephedrine is an essential ingredient and because Ohio limits the amount a person can purchase, meth cookers often ask other people to buy pseudoephedrine for them; these straw buyers are referred to as "smurfs."

[*P20]  Miller testified that although each individual ingredient used to produce methamphetamine may have an "innocent" use, he determined that the basement lab was a meth lab based on the "LQC" rule, which stands for "Location, Quantity, Combination."  Because all of the components needed to produce methamphetamine, as well as inject and smoke the drug, were located in the basement in multiple quantities, the basement was both a meth lab and a place w[h]ere the drug was used.

[*P21]  The grandmother testified that she had lived at the Maple Heights home

-4-

for 30 years.  On the night of the explosion, the grandmother was in bed with her breathing mask on when she heard a "big bang."  Grasso ran up and yelled there was a fire.  The grandmother ran outside.  Grasso picked up the grandfather, carried him outside, and threw him on the ground.

[*P22]  Local CVS pharmacy manager Brian Boyle testified that he reviewed pharmacy records and discovered that, on January 6, 2012, Grasso purchased pseudoephedrine, an ingredient used in making methamphetamine.  Kubinski, who was in the basement at the time of the explosion, and her sister, Jamie, also purchased pseudoephedrine on three separate days in January and February 2012.

[*P23]  In jailhouse recordings, Grasso admitted he lived at the Maple Heights home, had been burned in the fire, what happened was his fault, and he was sorry for hurting Needs's grandfather.  He stated, "Tell [the grandfather] I'm sorry I injured him" and "It's my * * * fault.  I shoulda just stuck to selling weed.  None of us would be in any trouble."  During a call to Needs, he told her to go try and recover any leftover batteries and that she did not deserve to go to jail because she did not do anything wrong. During one call he talked about one of their "smurf runs."

[*P24]  The trial court convicted Grasso of all charges. The court ordered a psychiatric mitigation report and a presentence investigation report. At the sentencing hearing, the trial court merged the drug charges and the state elected to proceed to sentencing on the illegal manufacture of drugs count. The trial court sentenced Grasso to seven years in prison for the drug conviction to run consecutive to three years for the aggravated arson counts. The trial court ordered the aggravated arson counts to run concurrent to each other, for a total sentence of ten years in prison.

*State v. Grasso*, 2013-Ohio-1894, 2013 Ohio App. LEXIS 1782 (Ohio Ct. App. May 9, 2013)

## II.  Procedural History

### A.  Conviction

On March 9, 2012, a Cuyahoga County Grand Jury charged Grasso with five counts of aggravated arson in violation of Ohio Revised Code ("O.R.C.") § 2909.02(A)(1) & (2); one count of the illegal manufacture or cultivation of drugs in violation of O.R.C. § 2925.04(C)(1); one count of assembly or possession of chemicals used to manufacture a controlled substance in violation of O.R.C. § 2925.041(A); and, one count of drug possession in violation of O.R.C. §

2925.11(A).  (ECF No.6-1, Exh. 2.)  On May 16, 2012, after a bench trial, Grasso was found

guilty as charged.  (ECF No. 6-1, Exh. 1.)  On August 1, 2012, the trial court sentenced Grasso

to an aggregate prison term of ten years.  (ECF No. 6-1, Exh. 5.)  The court merged the three

drug charges for purposes of sentencing.  *Id*.  Grasso received a seven year sentence for the

illegal manufacture or cultivation of drugs.  *Id*.  He was also sentenced to three years each for the

arson convictions to run concurrently to one another but consecutively to the seven year sentence

for the illegal manufacture of drugs.  *Id*.

## B.    Direct Appeal

On August 16, 2012, Grasso, through counsel, filed a Notice of Appeal with the Court of

Appeals for the Eighth Appellate District ("state appellate court"), raising the following

assignments of error:

> 1.    The trial court erred in entering a verdict of guilty of aggravated arson on
> Counts 4,5,6,7, and 8 of the indictment that was not supported by sufficient
> evidence, in violation of the Defendant's right to due process of law under
> the Fourteenth Amendment to the United States Constitution.
>
> 2.    The Defendant's sentence was contrary to law, and an abuse of discretion, in
> that the trial court imposed consecutive sentences without making the
> findings required by R.C. 2929.14(C).
>
> 3.    Defendant was denied due process of law when the court improperly
> sentenced defendant in the absence of special findings when the verdict was
> announced.
>
> 4.    Defendant was denied due process of law when he was convicted of offenses for
> which there was material variance.
>
> 5.    Defendant was denied effective assistance of counsel.[1]

_____

[1]  The first two assignments of error were raised by appellate counsel Russell Bensing.
(ECF No. 6-1, Exh.7.)  The additional three were raised in a supplemental brief by new
appellate counsel, Paul Mancino, Jr.  (ECF No. 6-1, Exh. 10.)

(ECF No. 6-1. Exhs. 6-7, 10.)

On May 19, 2013, Grasso's conviction was affirmed.  (ECF No. 6-1, Exh. 12.)  On May

20, 2013, Grasso filed a motion for reconsideration, which was denied.  (ECF No. 6-1, Exhs. 13

& 15.)

On July 16, 2013, Grasso filed a Notice of Appeal with the Supreme Court of Ohio.

(ECF No. 6-1, Exh. 16.)  Grasso, through counsel, raised the following propositions of law:

1.  The Defendant has been denied due process of law when the court rules that a legislative enactment can supercede the Fourth Amendment by creating exigent circumstances as a matter of law when no such circumstances exist as a matter of fact.

2.  Defendant has been denied his Sixth Amendment right where a court increases a sentence based upon judicial fact finding when none of the alleged facts were found at trial nor alleged in the indictment.

3.  The court, even in the trial without a jury, cannot enhance the degree of the offense where the court does not make a special finding concerning statutory enhancements.

4.  Defendant was denied due process of law when he was convicted of offenses for which there was material variance.

5.  Defendant has been denied effective assistance of counsel where counsel committed errors and omissions which deprived defendant of his Sixth Amendment right.

6.  Defendant has been denied due process of law where insufficient evidence has been presented to permit a rational fact finder to return the verdict of guilty.

(ECF No. 6-1, Exh. 17.)

On November 6, 2013, the Supreme Court declined to accept jurisdiction of the appeal

pursuant to Ohio S. Ct. Prac. R. 7.08(B)(4).  (ECF No. 6-1, Exh. 19.)

-7-

C.    **Federal Habeas Petition**

On November 26, 2013, Grasso filed a Petition for Writ of Habeas Corpus asserting the following grounds for relief:

**GROUND ONE**: Fourth Amendment

Supporting Facts: The Court of appeals for Cuyahoga County ruled that §2933.33(A) of the Ohio Revised Code trumped the Fourth Amendment of the United States Constitution because the statute authorized the warrantless entry into the residence of petitioner without a search or an arrest warrant.

**GROUND TWO**: Sixth and Fourteenth Amendment

Supporting Facts: Petitioner was denied his Sixth Amendment right when the court increased his sentence based upon judicial factfinding when none of the alleged enhancing facts were found at trial nor alleged in the indictment.

**GROUND THREE**: Sixth and Fourteenth Amendment

Supporting Facts: The trial court improperly enhanced the degree of the offense where the trial court, in announcing its verdict, did not make any special findings concerning the existence of statutory enhancement which would increase the degree of the offense.

**GROUND FOUR**: Fourteenth Amendment

Supporting Facts: Petitioner was denied due process of law when convicted of offenses for which there was a material variance from those offenses as alleged in the indictment.

**GROUND FIVE**: Sixth Amendment

Supporting Facts: Petitioner was denied effective assistance of trial counsel where errors and omissions which deprived petitioner of his Sixth Amendment rights. One of the omissions by counsel is the failure to file a motion to suppress concerning the warrantless entry into his residence without a warrant. Therefore, counsel failed to seek a mental evaluation of petitioner or counsel acknowledged that petitioner had a series of mental health issues that had been identified by his mental health providers. Petitioner's counsel failed to object to improper arguing concerning the evidence by defense counsel.

**GROUND SIX**: Fourteenth Amendment

-8-

> Supporting Facts: Petitioner states that there was insufficient evidence presented at his trial to permit a rational factfinder to return a verdict of guilty which denied petitioner his constitutional right to have his guilt proven beyond a reasonable doubt.

(ECF No. 1.)

### III.  Exhaustion and Procedural Default

#### A.   Exhaustion Standard

Petitioners must exhaust their state remedies prior to raising claims in federal habeas corpus proceedings.  *See* 28 U.S.C. § 2254(b),( c).  This requirement is satisfied "when the highest court in the state in which the petitioner was convicted has been given a full and fair opportunity to rule on the petitioner's claims."  *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990).  However, if relief is no longer available in state court, exhaustion can be rendered moot:  "If no remedy exists, and the substance of a claim has not been presented to the state courts, no exhaustion problem exists; rather, it is a problem of determining whether cause and prejudice exist to excuse the failure to present the claim in the state courts."  *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994); *see Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001).

#### B.   Procedural Default Standard

Federal courts will not consider the merits of procedurally defaulted claims, unless the petitioner demonstrates cause for the default and prejudice resulting therefrom, or where failure to review the claim would result in a fundamental miscarriage of justice.  *See Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir.2006) (*citing Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)). A claim may become procedurally defaulted in two ways. *Id*.  First, a petitioner may procedurally default a claim by failing to comply with state procedural rules in presenting his claim to the appropriate state court.  *Id.*; *see also Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir.

1986). If, due to petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.[2] *Id.*

Second, a petitioner may also procedurally default a claim by failing to raise and pursue that claim through the state's "ordinary appellate review procedures." *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999). If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, it is procedurally defaulted. *Engle v. Isaac*, 456 U.S. 107, 125 n. 28 (1982); *see also Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991); *Lovins*, 712 F.3d at 295 ("a claim is procedurally defaulted where the petitioner failed to exhaust state court remedies, and the remedies are no longer available at the time the federal petition is filed because of a state procedural rule.") This second type of procedural default is often confused with exhaustion. Exhaustion and procedural default, however, are distinct concepts. AEDPA's exhaustion requirement only "refers to remedies still available at the time of the federal petition." *Engle*, 456 U.S. at 125 n. 28. Where state court remedies are no longer available to a petitioner because he failed to use them within the required time period, procedural default and

---

[2] In *Maupin*, the Sixth Circuit established a four-step analysis to determine whether a claim is procedurally defaulted. 785 F.2d at 135. Under this test, the Court decides (1) whether the petitioner failed to comply with an applicable state procedural rule, (2) whether the state courts actually enforced the state procedural sanction, (3) whether the state procedural bar is an "independent and adequate" state ground on which the state can foreclose federal review, and (4) whether the petitioner has demonstrated "cause" and "prejudice." *Id.* at 138-39; *Barkley v. Konteh*, 240 F.Supp.2d 708 (N.D. Ohio 2002). "In determining whether a state court actually enforced a procedural sanction, we apply the 'plain statement' rule of *Michigan v. Long*, 463 U.S. 1032, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983)." *Lovins v. Parker*, 712 F.3d 283, 296 (6th Cir. 2013) ("a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on the procedural bar.") (citations omitted).

not exhaustion bars federal court review.  *Id.*  In Ohio, a petitioner is not entitled to raise claims in post-conviction proceedings where those claims could have been raised on direct appeal.  *Id.*  Thus, if an Ohio petitioner failed to raise a claim on direct appeal, which could have been raised, the claim is procedurally defaulted.  *Id.*

A claim is adequately raised on direct appeal if it was "fairly presented" to the state court.  To fairly present a claim to a state court a petitioner must assert both the legal and factual basis for his claim.  *See McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).  Accordingly, a "petitioner must present his claim to the state courts as a federal constitutional issue--not merely as an issue arising under state law."  *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984).  A petitioner can take four actions in his brief which are significant to the determination as to whether a claim has been fairly presented as a federal constitutional claim: "(1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law."  *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003).

A petitioner's procedural default, however, may be excused upon a showing of "cause" for the procedural default and "actual prejudice" from the alleged error.  *See Maupin*, 785 F.2d at 138-39.  "Demonstrating cause requires showing that an 'objective factor external to the defense impeded counsel's efforts to comply' with the state procedural rule."  *Franklin v. Anderson*, 434 F.3d 412, 417 (6th Cir. 2006) (*quoting Murray v. Carrier*, 477 U.S. 478, 488 (1986)).  Meanwhile, "[d]emonstrating prejudice requires showing that the trial was infected with

-11-

constitutional error." *Id.* Where there is strong evidence of a petitioner's guilt and the evidence

supporting petitioner's claim is weak, the actual prejudice requirement is not satisfied. *See*

*United States v. Frady*, 456 U.S. 152, 172 (1982); *Perkins v. LeCureux*, 58 F.3d 214, 219-20 (6th

Cir. 1995); *Rust v. Zent*, 17 F.3d 155, 161-62 (6th Cir. 1994). Prejudice does not occur unless

petitioner demonstrates "a reasonable probability" that the outcome of the trial would have been

different. *See Mason v. Mitchell*, 320 F.3d 604, 629 (6th Cir. 2003) (*citing Strickler v. Greene*,

527 U.S. 263, 289 (1999)).

Finally, a petitioner's procedural default may also be excused where a petitioner is

actually innocent in order to prevent a "manifest injustice." *See Coleman v. Thompson*, 501 U.S.

722, 749-50 (1991). Conclusory statements are not enough – a petitioner must "support his

allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific

evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented

at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995)*; See Jones v. Bradshaw*, 489 F.Supp.2d 786,

807 (N.D.Ohio 2007).

**C.    Application**

Respondent argues that Grasso's first ground for relief is procedurally defaulted. (ECF

No. 6 at 10.) Specifically, Respondent points out that ground one was not raised before the state

appellate court but was raised for the first time before the Supreme Court of Ohio. *Id.* In his

traverse, Grasso argues that the basis for ground one arose only after the state appellate court

found that trial counsel was not ineffective for failing to file a motion to suppress. (ECF No. 7 at

2.) A review of Grasso's filing before the Ohio Supreme Court reveals that he argued the Fourth

Amendment issue both as a free standing claim and through the lens of an ineffective assistance

-12-

of counsel argument stemming from the failure to file a motion to suppress.  (ECF No. 6-1, Exh.

17.)  It is undisputed that the latter claim was raised at all levels.  While it is unclear why Grasso

separated his Fourth Amendment warrantless search claim into two separate arguments before

the Ohio Supreme Court and before this Court, the issue was plainly raised and, therefore,

Respondents argument that it is procedurally defaulted is without merit.[3]

## IV.  Review on the Merits

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA"), 28 U.S.C. § 2254.  *See Lindh v. Murphy*, 521 U.S. 320, 326-27, 337 (1997).  The

relevant provisions of AEDPA state:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable
> > application of, clearly established Federal law, as determined by the
> > Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of
> > the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (1996).

Clearly established federal law is to be determined by the holdings of the United States

Supreme Court.  *See Parker v. Matthews,* 132 S. Ct. 2148, 2012 WL 2076341, *6 (U.S. Jun. 11,

---

[3]  Nonetheless, when addressing the issue on the merits, the Court will consider Grasso's
ground one Fourth Amendment claim together with his ground six ineffective
assistance of trial counsel claim.  The Court does not construe the Fourth Amendment
suppression argument raised in ground one as a freestanding claim, and will only
consider it through the lens of an ineffective assistance of trial counsel claim for failing
to file a motion to suppress – the avenue by which the issue was first raised by Grasso on
direct appeal.

2012); *Renico v Lett,* 559 U.S. –, 130 S.Ct. 1855, 1865-1866 (2010); *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005). However, an explicit statement by the Supreme Court is not mandatory; rather, "the legal principles and standards flowing from [Supreme Court] precedent" also qualify as "clearly established law." *Ruimveld*, 404 F.3d at 1010 (*quoting Taylor v. Withrow*, 288 F.3d 846, 852 (6th Cir. 2002)) The Supreme Court has indicated, however, that circuit precedent does not constitute "clearly established Federal law, as determined by the Supreme Court." *Parker*, 2012 WL 2076341, *6; *Howes v. Walker,* 132 S.Ct. 2741, 2012 WL 508160 (2012).

A state court's decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. at 413. By contrast, a state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. However, a federal district court may not find a state court's decision unreasonable "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly." *Id*. at 411. Rather, a federal district court must determine whether the state court's decision constituted an objectively unreasonable application of federal law. *Id*. at 410-12. "This standard generally requires that federal courts defer to state-court decisions." *Strickland v. Pitcher*, 162 Fed. Appx. 511, 516 (6th Cir. 2006) (*citing Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998)).

-14-

In *Harrington v. Richter*, —— U.S. ——, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011), the Supreme Court held that as long as "fairminded jurists could disagree on the correctness of the state court's decision," relief is precluded under the AEDPA.  *Id*. at 786 (internal quotation marks omitted).  The Court admonished that a reviewing court may not "treat[ ] the reasonableness question as a test of its confidence in the result it would reach under *de novo* review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 785.  The Court noted that Section 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal." *Id*. (internal quotation marks omitted).  Therefore, a petitioner "must show that the state court's ruling ... was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 786–87.  This is a very high standard, which the Supreme Court readily acknowledged. *See id.* at 786 ("If this standard is difficult to meet, that is because it is meant to be.")

**A.    Grounds One and Five: Ineffective Assistance of Trial Counsel**

Grasso asserts that trial counsel was ineffective.  (ECF No. 1-2 at 5.)  To establish ineffective assistance of counsel, a petitioner must demonstrate that his counsel's conduct was so below acceptable standards of representation that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment to the United States Constitution. *See Strickland v. Washington*, 466 U.S. 668 (1984); *United States v. Bavers*, 787 F.2d 1022 (6th Cir. 1985).  A petitioner also must demonstrate that a trial counsel's performance prejudiced the petitioner's defense to such an extent that it rendered the proceeding unfair. *Id*.  To establish prejudice, the

-15-

"defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. In other words, a counsel's deficient performance must have "caused the defendant to lose what he otherwise would probably have won" and it must have been "so manifestly ineffective that defeat was snatched from the hands of probable victory." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992).

"[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Mere disagreements by a defendant with tactics or strategies employed by counsel are not enough to support a claim of ineffective assistance of counsel and there is a presumption that the challenged conduct of a petitioner's counsel was a matter of strategy. *Id*. at 689; *see also United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990).

As explained by the United States Supreme Court:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id*., at 689, 104 S. Ct. 2052, 80 L. Ed. 2d 674; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S., at ___, 129 S. Ct. 1411, 173 L. Ed. 2d 251. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ___, 129 S. Ct. 1411, 173 L. Ed. 2d 251. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington v. Richter,* 131 S. Ct. 770, 788 (U.S. 2011); *accord Kennedy v. Warren*, 2011 WL 1642194, *2 (6th Cir. May 3, 2011); *accord Goza v. Welch*, 2012 U.S. Dist. LEXIS 178665 at **24-25 (N.D. Ohio Dec. 18, 2012).

-16-

Specifically, Grasso asserts that trial counsel was ineffective for: (1) failing to file a motion to suppress the fruits of a warrantless search; (2) failing to seek a mental evaluation of his client; (3) failing to object to testimony that Grasso suffered burns on his hands; and, (4) failing to object to the admission of inaudible tape recordings. (ECF No. 7 at 12-15.)

### 1. Motion to Suppress

Grasso takes issue with the state court's finding that he failed to demonstrate ineffective assistance because the trial court would likely have denied any motion to suppress, thereby negating prejudice. The state appellate court found trial counsel was not ineffective for failing to file a motion to suppress, explaining as follows:

> [*P60] In the fifth and final assignment of error, Grasso claims he was denied effective assistance of trial counsel.

> [*P61] To establish ineffective assistance of counsel, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonable representation and that he was prejudiced by that performance. *State v. Drummond*, 111 Ohio St.3d 14, 2006 Ohio 5084, 854 N.E.2d 1038, ¶ 205, citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Prejudice is established when the defendant demonstrates

>> a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

> *Strickland* at 694.

> [*P62] In evaluating a claim of ineffective assistance of counsel, a court must be mindful that there are countless ways for an attorney to provide effective assistance in a given case, and it must give great deference to counsel's performance. *Id*. at 689. Trial tactics and strategies do not constitute a denial of effective assistance of counsel. *State v. Gooden*, 8th Dst. No. 88174, 2007 Ohio 2371, ¶ 38, citing *State v. Clayton*, 62 Ohio St.2d 45, 402 N.E.2d 1189 (1980).

> [*P63] Grasso claims counsel was ineffective for (1) failing to file a motion to suppress; (2) not seeking a mental evaluation of him; and (3) failing to object to

-17-

the jailhouse recordings and certain witness testimony.

i. Motion to Suppress

[*P64] Grasso argues that his counsel should have filed a motion to suppress the warrantless search of the house.

[*P65] It is well established that firefighters and police are authorized to remain on the scene for a reasonable time to investigate the cause, origin and circumstances of the fire. *State v. Behrens*, 8th Dist. No. 63837, 1993 Ohio App. LEXIS 5549, *9 (Nov. 18, 1993), citing *Michigan v. Clifford*, 464 U.S. 287, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984). In fact, pursuant to R.C. 3737.24, a fire marshal has two days, not including Sunday, to begin his or her investigation of a fire.

[*P66] Lieutenant Kavaliunas testified that he became suspicious of the fire because it appeared to originate in two different places in the basement. The fire department boarded up the house and secured the scene until they could return in the daylight. Fire Marshal Peterman responded to the scene and contacted members of SEALE, who obtained a search warrant for the premises. Thus, the additional search and the seizure of all items was pursuant to a warrant.

[*P67] Moreover, we realize the danger to the community that a meth lab poses. The Ohio legislature, in enacting R.C. 2933.33(A), has recognized the potential exigencies, independent of those of a fire, created by an illegal methamphetamine laboratory.

[*P68] Based on these facts, the trial court would likely have denied any motion to suppress the evidence seized from the premises. Thus, Grasso fails to demonstrate that his counsel was ineffective on this basis.

*Grasso*, 2013-Ohio-1894 at ¶¶60-68.

Grasso argues that absent exigent circumstances, the evidence seized from the scene of

the fire was fruit of the poisonous tree, as it stemmed from an unreasonable search and seizure.

(ECF No. 7 at 2-4.) Grasso cites a United States Supreme Court for the proposition that:

[A]n entry to fight a fire requires no warrant, and that once in the building, officials may remain there for a reasonable time to investigate the cause of the blaze. Thereafter, ***additional entries to investigate the cause of the fire must be made pursuant to the warrant procedures governing administrative searches***. *See Camara*, 387 U.S., at 534-539; *See v. Seattle*, 387 U.S., at 544-545; *Marshall*

-18-

> *v. Barlow's, Inc.*, *ante*, at 320-321.  Evidence of arson discovered in the course of such investigations is admissible at trial, but if the investigating officials find probable cause to believe that arson has occurred and require further access to gather evidence for a possible prosecution, they may obtain a warrant only upon a traditional showing of probable cause applicable to searches for evidence of crime. *United States v. Ventresca*, 380 U.S. 102.

*Michigan v. Tyler*, 436 U.S. 499, 511 (1978) (emphasis added).

The following facts can be gleaned from the record and the state court's decision:

- According to testimony from several sources, the fire in the house located at 19581 Raymond Street in Maple Heights, Ohio occurred on the night of February 23, 2012.  (ECF No. 5, Tr. 48, 66-67, 164, 171, 243.)  There was no power in the house after the fire, as normal fire protocol required that the electricity be shut off and it was pitch black.  (Tr. 94, 140-41.)

- Brian S. Peterman, a fire investigator with the State Fire Marshal's office, was contacted the night of the fire by the Maple Heights Fire Department ("MHFD").  He arrived on the scene of the fire first thing in the morning on February 24, 2012.  (ECF No. 5-2, Tr. 239-43.)

- William Gall of the Southeast Area Law Enforcement ("SEALE") Drug Task Force arrived on the scene of 19581 Raymond Street on February 24, 2012, while Mr. Peterman was still present.  (ECF No. 5, Tr. 89-91, 264.)

- According to the state appellate court's opinion, Mr. Gall and the SEALE unit obtained a search warrant and their additional search and seziure of evidence was accomplished pursuant to a warrant.  *Grasso*, 2013-Ohio-1894 at ¶66.  According to Grasso's traverse, which cites portions of the affidavit used to obtain the search warrant, the information used to obtain the warrant came from the February 24, 2012, investigation conducted by "State Fire Marshall Brian Peterson [sic]."[4]  (ECF No. 7 at 4-5.)

In *Michigan v. Tyler*, the same decision relied upon by Grasso, the United States Supreme

Court was also confronted with a night time fire, which was extinguished during the night, but

---

[4]  The search warrant and affidavit were not included among the exhibits filed with this Court.  Nonetheless, Grasso does not challenge that a warrant existed for the second search, nor does he cite any specific defects in the warrant beyond challenging the propriety of Peterman's presence in the charred premises.

-19-

the fire chief's investigation was "severely hindered by darkness, steam, and smoke..."  436 U.S. at 511.  The fire investigators returned shortly after daylight to investigate the cause of the fire.  *Id*.  The Supreme Court found that "[o]n the facts of this case, we do not believe that a warrant was necessary for the early morning re-entries on January 22....  Little purpose would have been served by their remaining in the building, except to remove any doubt about the legality of the warrantless search and seizure later that same morning.  Under these circumstances, we find that the morning entries were no more than an actual continuation of the first, and the lack of a warrant thus did not invalidate the resulting seizure of evidence."  *Id*.  The Supreme Court disagreed with the Michigan Supreme Court's holding, and characterized the latter's finding as standing for the misguided proposition that "the exigency justifying a warrantless entry to fight a fire ends, and the need to get a warrant begins, with the dousing of the last flame."  *Id*. at 510 ("We think this view of the firefighting function is unrealistically narrow.")  Instead, the Supreme Court explained as follows:

> Fire officials are charged not only with extinguishing fires, but with finding their causes.  Prompt determination of the fire's origin may be necessary to prevent its recurrence, as through the detection of continuing dangers such as faulty wiring or a defective furnace.  Immediate investigation may also be necessary to preserve evidence from intentional or accidental destruction.  And, of course, the sooner the officials complete their duties, the less will be their subsequent interference with the privacy and the recovery efforts of the victims.  For these reasons, officials need no warrant to remain in a building for a reasonable time to investigate the cause of a blaze after it has been extinguished.  **And if the warrantless entry to put out the fire and determine its cause is constitutional, the warrantless seizure of evidence while inspecting the premises for these purposes also is constitutional**.

*Michigan v. Tyler*, 436 U.S. at 510 (emphasis added).  A later decision of the Supreme Court clarified that while fire and police officials may remain after a fire has been extinguished for "a reasonable time" to investigate the cause of a blaze, "where a homeowner has made a reasonable

-20-

effort to secure his fire-damaged home after the blaze has been extinguished and the fire and police units have left the scene, we hold that a subsequent postfire search must be conducted pursuant to a warrant, consent, or the identification of some new exigency." *Michigan v. Clifford*, 464 U.S. 287, 293-97 (1984).

Mr. Peterson's early morning investigation after the previous night's fire is squarely on point with the facts of the Supreme Court's *Tyler* decision.  The state appellate court expressly referenced the *Michigan v. Clifford* decision, indicating that firefighters and police may remain on the scene to investigate a fire for a reasonable time.  *Grasso*, 2013-Ohio-1894 at ¶65.  As such, this Court cannot find that the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court.  As for the second search conducted by Mr. Gall and the SEALE team, the state court found that the latter search was conducted pursuant to a warrant.  Grasso has not argued that this factual finding was inaccurate or given this Court any basis for making such a determination.

Grasso asserts that the state appellate's court finding – that the motion to suppress would have been denied by the trial court had one been filed – was based on an Ohio statute, which cannot supercede a defendant's federal constitutional rights.[5]  (ECF No. 7 at 2-7.)  Whether "exigent circumstances" can be statutorily created is an interesting constitutional question.

_____

[5] O.R.C. § § 2933.33(A) states that "[i]f a law enforcement officer has probable cause to believe that particular premises are used for the illegal manufacture of methamphetamine, for the purpose of conducting a search of the premises without a warrant, the risk of explosion or fire from the illegal manufacture of methamphetamine causing injury to the public constitutes exigent circumstances and reasonable grounds to believe that there is an immediate need to protect the lives, or property, of the officer and other individuals in the vicinity of the illegal manufacture."

However, as the state court's decision was based on a reasonable application of clearly established federal law, it is unnecessary to decide the statutory issue raised by Grasso.

For the foregoing reasons, the state appellate court's determination that counsel was not ineffective for failing to file a motion to suppress was reasonable, and Grasso's argument in grounds one and six are without merit.

### 2.  Mental Evaluation

Grasso also avers that counsel was ineffective for failing to seek a mental evaluation of his competency to stand trial.  (ECF No. 7 at 13.)  The state appellate court addressed Grasso's argument as follows:

> [*P69]  Next, Grasso claims his attorney was ineffective for failing to request a competency evaluation.
>
> [*P70]  A defendant is presumed to be competent to stand trial unless proof by a preponderance of the evidence is presented as to the defendant's incompetency. *State v. Berry*, 72 Ohio St.3d 354, 360, 1995 Ohio 310, 650 N.E.2d 433.  A defendant is legally incompetent if "incapable of understanding the nature and objective of the proceedings against [him] or of assisting in [his] defense[.]"  R.C. 2945.37(G); *State v. Tibbetts*, 92 Ohio St.3d 146, 164, 2001 Ohio 132, 749 N.E.2d 226.
>
> [*P71]  A defendant has the right to a hearing on the issue of competency "where the record contains 'sufficient indicia of incompetence,' such that an inquiry into the defendant's competency is necessary to ensure the defendant's right to a fair trial." *Berry* at 359, citing *Drope v. Missouri*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975).  But defense counsel need not raise meritless issues or even all arguably meritorious issues.  *State v. Taylor*, 78 Ohio St.3d 15, 31, 1997 Ohio 243, 676 N.E.2d 82.
>
> [*P72]  In this case, there was no indication Grasso had any mental health issues until sentencing.  The record also does not indicate that his mental health in any way affected his ability to assist in his own defense.  Grasso has failed to demonstrate any prejudice or to show that had his counsel requested a competency evaluation that the results of his trial would have been different.

*Grasso*, 2013-Ohio-1894 at ¶¶69-72.

Neither Grasso's petition nor traverse presents any meaningful argument as to how the state appellate court's decision either unreasonably applied clearly established federal law or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented.  Instead, Grasso merely reiterates the same argument he made in his brief before the state appellate court without attempting to explain how the state court's decision was contrary to federal law.  Furthermore, Grasso presented no evidence demonstrating that he was, in fact, incompetent to stand trial.  Instead, Grasso's traverse appears to be based purely on layers of conjecture, suggesting that *if* trial counsel had conducted a sufficient investigation, the results *may* have necessitated a motion for a mental evaluation, which presumably *could* have resulted in a determination that Grasso was incompetent.  (ECF No. 7.)

While Grasso's presentence investigation appears to have revealed the presence of some mental health issues and a history of substance abuse, there is simply no indication that he was incompetent to stand trial.  This Court cannot find that the state appellate court's determination – that counsel was not ineffective for failing to seek a competency evaluation – was contrary to or constituted an unreasonable application of clearly established federal law.  There is simply no indication that Grasso was incompetent to stand trial.  Absent such evidence, it cannot reasonably be argued that Grasso was prejudiced by counsel's allegedly deficient performance.

### 3.  Failure to Object to Testimony and Audio Recordings

Grasso asserts that counsel was ineffective for failing to object to the admission of audio recordings at trial of phone calls that Grasso made from jail.  Grasso asserts that the calls were inaudible and their admission requires a reversal.  (ECF No. 7.)  The state appellate court found as follows:

-23-

[*P74]  As to the jailhouse recordings, there is nothing in the record to indicate that they were inaudible.  Moreover, in a bench trial, the trial court is presumed only to allow into evidence that evidence which is relevant and admissible. *State v. Gale*, 8th Dist. No. 94872, 2011-Ohio-1236, ¶22.

*Grasso*, 2013-Ohio-1894 at ¶74.

Grasso essentially raises the same argument as before the state appellate court, but fails to offer any assessment as to how that court's decision was either contrary to or involved an unreasonable application of clearly established federal law.  While Grasso points to some portions of the transcript (ECF No. 7 at 13, Tr. 284-85, 288, 290), none of those portions establish that the audio recordings were "inaudible."  In one instance, the judge indicated that he "couldn't hear that one," after which the tape was played again.  (Tr. 284.)  There is no indication the judge could not hear the tape the second time.  *Id.*  Regarding another recording, when counsel asked whether it was audible, the judge responded "[f]or what it's worth."  (Tr. 285.)  Nothing on page 288 of the transcript implicates the audibility of the recordings, while on the next page the judge asks the attorneys to play the "most audible" recording.  (Tr. 290.)  Because it was not clearly established that any of the calls were inaudible, the Court cannot see how failing to object to the recordings on that basis was tantamount to ineffective assistance of counsel.  Furthermore, to establish ineffective assistance, Grasso must demonstrate a reasonable probability that, but for counsel's errors or omissions, the result of the proceeding would have been different.  Even assuming *arguendo* that the recordings were inaudible to the judge, who was also the finder of fact, it is patently unclear how the admission of inaudible recordings prejudiced Grasso to such an extent that there would have been a reasonable probability of a different outcome.

Finally, Grasso also challenged his counsel's failure to object to witness statements that

-24-

he suffered burns on his hands.  (ECF No. 7 at 13-14.)  With respect to this issue, the state

appellate court found that "Grasso himself admitted on the jailhouse recordings that his hands

indeed suffered burns." *Grasso*, 2013-Ohio-1894 at ¶75.  Given this admission, it is unclear how

trial counsel was ineffective.  Furthermore, it is again unclear how a timely filed objection to

such testimony prejudiced Grasso to such an extent that there would have been a reasonable

probability of a different outcome. *See, e.g., Franklin v. Bradshaw*, 695 F.3d 439, 452 (6th Cir.

2012) ("It causes no prejudice not to raise an argument that would have lost anyway.")

For the foregoing reasons, Grasso's various arguments alleging that trial counsel was

ineffective are without merit.

**B.    Grounds Two and Three: Sentence**

In his second ground for relief, Grasso asserts that his Sixth Amendment rights were

violated when the trial court "increased his sentence based upon judicial factfinding when none

of the alleged enhancing facts were found at trial nor alleged in the indictment."  (ECF No. 1-2.)

In his third ground for relief, Grasso appears to also allege a Sixth Amendment violation, and

complains that the trial court did not make any special findings that would permit statutory

enhancement of the offense. *Id*.  Grasso's petition fails to elaborate on any of these general

assertions. *Id*.  In his traverse, with respect to both grounds two and three (and elsewhere in the

petition), Grasso fails to make any reference to the state appellate court's decision regarding this

ground for relief.  Furthermore, despite a passing and unexplained references to the Sixth

Amendment, Grasso's argument as to both grounds two and three appear to be firmly rooted in

state law.  (ECF No. 7 at 7-11.)  With respect to ground two, Grasso references Ohio Criminal

Rule of Procedure 32(A)(4), as well as several Ohio Supreme Court and appellate court

decisions, and appears to be arguing that the trial court failed to comply with Ohio law.  (ECF No. 7 at 7-9.)  With respect to ground three, Grasso plainly asserts that the imposition of his sentence violated the Ohio Supreme Court's holding in *State v. Pelfrey*, 112 Ohio Sr.3d 422, 860 N.E.2d 735 (Ohio 2007).  (ECF No. 7 at 9-11.)

The United States Supreme Court has stated many times that "federal habeas corpus relief does not lie for errors of state law."  *Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S. Ct. 3092, 111 L. Ed. 2d 606 (1990); *accord Estelle v. McGuire*, 502 U.S. 62, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991); *Pulley v. Harris*, 465 U.S. 37, 41, 104 S. Ct. 871, 79 L. Ed. 2d 29 (1984).  "[A] claim that the trial court violated state law when sentencing a prisoner is not cognizable in a habeas corpus proceeding."  *Terry v. Trippett*, 1995 U.S. App. LEXIS 23150 (6th Cir. Aug. 7, 1995); *accord King v. Curtin*, 2014 U.S. Dist. LEXIS 108825 (E.D. Mich. Aug. 7, 2014).  As his arguments in grounds two and three are based on perceived errors in state sentencing laws, Grasso fails to present cognizable habeas claims.

Grasso does sprinkle his traverse with occasional and largely unexplained citations to several United States Supreme Court decisions when discussing the issues raised in grounds two and three.  However, simply stating that the Eighth Amendment prohibits grossly disproportionate sentences or stating, without explanation, that the sentence runs afoul of *Blakely v. Washington*, 542 U.S. 296 (2004) or *McCormick v. United States*, 500 U.S. 257 (1991) is insufficient to raise an argument.  It is not this Court's function to develop an argument on a petitioner's behalf, especially where he is represented by counsel.  *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to

-26-

mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones."); *Meridia Prods. Liab. Litig. v. Abbott Labs.*, No. 04-4175, 447 F.3d 861, 2006 U.S. App. LEXIS 11680 (6th Cir. May 11, 2006).  Grasso has not attempted to make a rudimentary *Blakely* argument or Eighth Amendment claim.[6]  As they contain no developed arguments alleging violations of clearly established federal law, grounds two and three fail to raise cognizable claims.

**C.  Ground Four: Variance**

In his fourth ground for relief, Grasso asserts that he was denied due process of law, because he was convicted of offenses that materially varied from those alleged in the indictment. Specifically, Grasso argues that the indictment alleged that all of the offenses occurred on or about February 23, 2012, but that "[t]he only evidence presented concerning the purchase of materials that could be used for the production of methamphetamine was a purchase made on January 6, 2012."  (ECF No. 7 at 11.)

The Sixth Circuit Court of Appeals has explained that "[a] constructive amendment results when the terms of an indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than one charged in the indictment."  *United States v. Smith*, 320 F.3d 647, 656 (6th Cir. 2003); *see also*

---

[6] The Court notes that in the petition, Grasso does not characterize grounds two or three as raising an Eighth Amendment claim.  In addition, his traverse makes no attempt to explain how the *Blakely* decision, which found that facts supporting an increase of a sentence beyond the 'statutory maximum' must be admitted by the defendant or proven to a jury beyond a reasonable doubt, applies to bench trials where the judge is also the finder of fact.

*Stirone v. United States*, 361 U.S. 212, 216, 80 S. Ct. 270, 4 L. Ed. 2d 252 (1960) (noting that "a court cannot permit a defendant to be tried on charges that are not made in the indictment against him"); *United States v. Budd*, 496 F.3d 517, 521 (6th Cir. 2007).  A constructive amendment is *per se* prejudicial and requires reversal of the resulting conviction. *Budd*, 496 F.3d at 521; *see also United States v. Hynes*, 467 F.3d 951, 962 (6th Cir. 2006).

Variances, by contrast, are not *per se* prejudicial.  *Budd*, 496 F.3d at 521. The Sixth Circuit has explained that, "[g]enerally speaking, a variance 'occurs when the charging terms [of the indictment] are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment.'" *Id.* (quoting *United States v. Prince*, 214 F.3d 740, 756-57 (6th Cir. 2000).  "To obtain reversal of a conviction because of a variance between the indictment and the evidence produced at trial, a defendant must satisfy a two-prong test: (1) the variance must be demonstrated and (2) the variance must affect some substantial right of the defendant." *Prince*, 214 F.3d at 757 (*citing United States v. Maliszewski*, 161 F.3d 992, 1014 (6th Cir. 1998)); *see also United States v. Hynes*, 467 F.3d 951, 962 (6th Cir. 2006); *United States v. Suarez*, 263 F.3d 468, 478 (6th Cir. 2001).  Prejudice to substantial rights occurs if the defendant is "not enabled to present his defense and not be taken by surprise by the evidence offered at trial," or is not "protected against another prosecution for the same offense."  *Budd*, 496 F.3d at 527 (quoting *Berger v. United States*, 295 U.S. 78, 82, 55 S. Ct. 629, 79 L. Ed. 1314 (1935)).[7]

---

[7]  While the Supreme Court has not used the terms "constructive amendment" and "variance" in this context, it recognized the concepts addressed herein in *Berger*, 295 U.S. at 81 and *Stirone*, 361 U.S. at 216.  The Sixth Circuit has interpreted these cases as constituting "clearly established federal law" for purposes of federal habeas review, when considering a state court's determination that an indictment had not been constructively amended.  *See Swanigan v. Sherry*, 502 Fed. App'x. 544, 2012 WL 4946291 (6th Cir. 2012).

The state appellate court addressed Grasso's argument as follows:

[*P56]  In the fourth assignment of error, Grasso argues that he was denied due process of law because there was no evidence that he committed the offense on February 23, 2012, as charged in Count 2 of the indictment.

[*P57]  Count 2 of the indictment charged that on or about February 23, 2012, in violation of R.C. 2925.041(A), Grasso "did knowingly assemble or possess one or more chemicals that may be used to manufacture a controlled substance in schedule I or II with the intent to manufacture a controlled substance in schedule I or II, to wit, methamphetamine."

[*P58]  Grasso claims that he could not be convicted of this count because the only evidence the state offered showing Grasso purchased materials to make methamphetamine was a January 6, 2012 receipt for pseudoephedrine. But the state provided ample evidence that Grasso possessed, either personally or constructively, the ingredients needed to make methamphetamine and was, in fact, in possession of the ingredients on February 23, 2012, when the explosion occurred. R.C. 2925.041(B) only requires assembly or possession of a single chemical necessary in the manufacture of a controlled substance, but **here, the police and fire marshal recovered all the ingredients from the basement and garage that are necessary to make methamphetamine**.

*Grasso*, 2013-Ohio-1894 at ¶¶56-58 (emphasis added).

Essentially, the state appellate court disagreed with Grasso's factual assertion that the only evidence he possessed the needed ingredients occurred on January 6, 2012. Grasso, however, has simply reiterated his argument made before the state appellate court without including any discussion of the state court's factual finding. Factual determinations made by state courts are presumed correct. 28 U.S.C. § 2254(e)(1); *see also Franklin*, 695 F.3d at 447. Grasso has presented no argument rebutting the presumption that law enforcement officials did indeed recover all the requisite ingredients from the basement and garage of Grasso's residence.

Given the state court's factual findings, Grasso's argument that there was a variance is simply untenable and his ground for relief meritless.

-29-

**D.  Ground Six: Sufficiency of the Evidence**

In his final ground for relief, Grasso argues that there was insufficient evidence to support his convictions.  (ECF No. 7 at 15-16.)  However, in his brief argument, Grasso challenges only the sufficiency of his aggravated arson convictions.  *Id*.  Specifically, Grasso asserts that there was no evidence that he knowingly created a substantial risk of serious physical harm to another by means of a fire or explosion.  *Id*.

The Due Process Clause of the Fourteenth Amendment requires that a criminal conviction be supported by proof beyond a reasonable doubt with respect to every fact necessary to constitute the offense charged.  *In re Winship*, 397 U.S. 358, 363-64, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970).  The standard for determining if a conviction is supported by sufficient evidence is "whether after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 317, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979).  In making such a determination, a district court may not substitute its own determination of guilt or innocence for that of the factfinder, nor may it weigh the credibility of witnesses. *See id.*; *Walker v. Engle*, 703 F.2d 959, 970 (6th Cir. 1983).  Moreover, federal courts are required to give deference to factual determinations made in state court and "[a]ny conflicting inferences arising from the record . . . should be resolved in favor of the prosecution." *Heinish v. Tate*, 1993 U.S. App. LEXIS 29301, 1993 WL 460782 at * 3 (6th Cir. 1993) citing *Walker*, 703 F.3d at 969-70; *Wright v. West*, 505 U.S. 277, 296, 112 S. Ct. 2482, 120 L. Ed. 2d 225 (1992) (the deference owed to the trier of fact limits the nature of constitutional sufficiency review.)

Consistent with these principles, the Supreme Court recently emphasized that habeas courts

-30-

must review sufficiency of the evidence claims with "double deference:"

> We have made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference. First, on direct appeal, 'it is the responsibility of the jury — not the court— to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury.' *Cavazos v. Smith*, 565 U.S. 1,  , 181 L. Ed. 2d 311, 181 L.Ed.2d. 311 (2011) (*per curiam*). And second, on habeas review, 'a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Ibid.* (quoting *Renico v. Lett*, 559 U.S. 766 , 772, 130 S. Ct. 1855, 1862, 176 L. Ed. 2d 678 (2010)).

*Coleman v. Johnson*, 132 S.Ct. 2060, 2062, 182 L. Ed. 2d 978 (2012). Under this standard, "we cannot rely simply upon our own personal conceptions of what evidentiary showings would be sufficient to convince us of the petitioner's guilt," nor can "[w]e . . . inquire whether any rational trier of fact would conclude that petitioner ... is guilty of the offenses with which he is charged." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009). Rather, a habeas court must confine its review to determining whether the state court "was unreasonable in its conclusion that a rational trier of fact could find [petitioner] guilty beyond a reasonable doubt based on the evidence introduced at trial." *Id.* (emphasis in original) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 129 S.Ct. 1411, 1420, 173 L.Ed.2d 251 (2009)).

The state appellate court addressed Grasso's sufficiency claim as follows:

> [*P27] A challenge to the sufficiency of the evidence supporting a conviction requires the court to determine whether the state has met its burden of production at trial. *State v. Givan*, 8th Dist. No. 94609, 2011 Ohio 100, citing *State v. Thompkins*, 78 Ohio St.3d 380, 1997 Ohio 52, 678 N.E.2d 541. On review for sufficiency, courts are to assess not whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction. *Id.*

> [*P28] The relevant inquiry is whether, after viewing the evidence in a light most

-31-

favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

[*P29]  Grasso was convicted of four counts of aggravated arson in violation of R.C. 2909.02(A)(1), which provides that "[n]o person, by means of fire or explosion, shall knowingly * * * [c]reate a substantial risk of serious physical harm to any person other than the offender."  Grasso was also convicted of one count of aggravated arson in violation of R.C. 2909.02(A)(2), which provides that "[n]o person, by means of fire or explosion, shall knowingly * * * [c]ause physical harm to any occupied structure."

[*P30]  Grasso contends that the state failed to show sufficient evidence that he acted "knowingly," *i.e.*, the state failed to establish that Grasso knew his actions would probably result in a fire or explosion that created a substantial risk of serious physical harm to another person or caused physical harm to the house. The term "knowingly" is defined by R.C. 2901.22(B):

> A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist.

[*P31]  We find that the state showed sufficient evidence that Grasso had knowledge that producing or cooking methamphetamine could probably result in a fire or explosion.  BCI agent Miller testified that the process of producing methamphetamine is volatile, and that certain ingredients are caustic, highly reactive.  Part of the process "gets hot enough to ignite, burns 1,200 degrees." Methamphetamine producers "have a heat source.  The vapors coming off of there are extremely volatile and dangerous."  Miller explained how a methamphetamine cooker has to heat up a plastic container filled with solvents and alcohol as part of the cooking process.  Part of the process is to create chemical reactions, "chemical heat."  He further testified that the "reaction happens in the bottle.  It's very volatile.  It gets to rolling.  The lithium metal will react and you'll see flames inside the [plastic] bottle."

[*P32]  Miller explained how a one-pot cooking method can "fail," or catch on fire or explode.  If the person making the drug does "burp the bottle," by repeatedly releasing the air from the bottle, it can "blow the top off and pieces come out and catch on fire."  Or, he explained, the lithium

> gets trapped against the plastic down at the bottom or the side [of the bottle].  And the water, because it's getting generated, hits it and it burns at 1,200 degrees and melts the whole inside of the container. And since

-32-

it's under pressure [it ignites.]

[*P33]  Miller opined that the fire was caused by a meth lab based on both the burn patterns he saw in the evidence photographs and the vast amount of evidence that was collected from the scene that contained all the ingredients needed to manufacture the drug.

[*P34]  Fire Marshall Peterson testified that when he entered the basement of the home and saw the Coleman fuel can, he immediately suspected that a meth lab had caught fire.  He opined that Grasso sustained the burns to his hands trying to carry the "one-pot" container from one area of the basement to the other after it caught fire.  He also opined that the vapors or fumes that arise during methamphetamine production are "deadly," and there is a "fire" and "heated gas" that creates toxic smoke.

[*P35]  When asked by the state what the potential dangers of methamphetamine production are, he stated that making meth is

> [v]ery dangerous with the amount of chemicals, such as the Coleman fuel, very flammable liquid, and then the use of those lithium batteries. The amount of lithium batteries that were collected [in the basement] could have totally destroyed the whole house if the fire department hadn't gotten there quickly.

He also explained that a person making the drug would use a respirator so as not to breathe in the vapors.

[*P36]  When asked by defense counsel if the fire was an accident based on reckless production of the drug, Peterson answered:

> Peterson: I think that they know when they're creating or manufacturing the meth what the hazards are, what the dangers are in that.

> Defense Counsel: But the fire itself was an accident, you'll agree with me, in all fairness?

> Peterson: No, I'm not going to say that.  They know when they're in there making meth they're creating that hazard.  They're intentionally making an illegal substance, which created a hazard that caused fire.

[*P37]  The propriety of an offender who operates a methamphetamine lab that catches fire being charged with arson appears to be a case of first impression in Ohio.  In looking to other states, however, we found arson statutes that deal specifically with fires caused by methamphetamine labs.  *See* 569.040 R.S.Mo.

-33-

(Missouri) ("A person commits the crime of arson in the first degree * * * [b]y starting a fire or explosion, damages a building or inhabitable structure in an attempt to produce methamphetamine"); Texas Pen. Code 28.02(a-1) ("A person commits an offense if the person recklessly starts a fire or causes an explosion while manufacturing or attempting to manufacture a controlled substance and the fire or explosion damages any building, habitation, or vehicle.")

[*P38]  Further, the risk of fire from methamphetamine production is evident in Ohio law. R.C. 2933.33(A) provides:

> If a law enforcement officer has probable cause to believe that particular premises are used for the illegal manufacture of methamphetamine, for the purpose of conducting a search of the premises without a warrant, the risk of explosion or fire from the illegal manufacture of methamphetamine causing injury to the public constitutes exigent circumstances and reasonable grounds to believe that there is an immediate need to protect the lives, or property, of the officer and other individuals in the vicinity of the illegal manufacture.

[*P39]  "It is clear that the legislature has deemed the very real threat of explosion and fire due to the volatility of the materials used to produce methamphetamine a sufficient enough threat to justify warrantless searches." *State v. Sandor*, 9th Dist. No. 23353, 2007 Ohio 1482, ¶ 11.  We discuss this issue more under the fifth assignment of error; at this juncture, we find the statute instructive as it shows the legislature's knowledge of the risk of fires incident to methamphetamine production.

[*P40]  Based on the above testimony, there was sufficient evidence to support that Grasso knowingly engaged in an activity that would probably cause a fire, i.e., producing methamphetamine.  Not only were the ingredients used in cooking the drug highly flammable, but part of the process in making the drug is to create an actual fire inside a plastic bottle. Moreover, there were multiple vessels found in the basement and garage that evidenced that prior batches of methamphetamine had been produced in the basement of the house.

[*P41]  In light of the above, the arson convictions were supported by sufficient evidence.  The first assignment of error is overruled.

*Grasso*, 2013-Ohio-1894 at ¶¶56-58 (emphasis added).

Grasso essentially raises the exact argument here as in his state appellate brief, but fails to

offer any assessment as to how that court's decision was either contrary to or involved an

-34-

unreasonable application of clearly established federal law.  Moreover, this Court cannot overrule a state court's interpretation of state law.  *See, e.g., Vroman v. Brigano*, 346 F.3d 598, 604 (6th Cir. 2003) ("Federal courts are obligated to accept as valid a state court's interpretation of state law and rules of practice of that state."); *see also Riley v. Woods*, 2010 U.S. Dist. LEXIS 81453, 11-12 (E.D. Mich., Aug. 11, 2010) ("A federal habeas court must therefore defer to a state appellate court's construction of the elements of state crimes.") (*citing Sanford v. Yukins*, 288 F. 3d 855, 862 (6th Cir. 2002); *Coe v. Bell*, 161 F. 3d 320, 347 (6th Cir. 1998)).  As such, this Court must defer to the state courts as to the parameters of the *mens rea* element, which required that Grasso act "knowingly."

In his traverse, Grasso argues that "the state never presented any evidence that there was a likelihood that that activity would result in fire or explosion."  (ECF No. 7 at 15.)  Grasso's assertion completely ignores the testimony of agent Miller, cited by the appellate court, that the process of methamphetamine production was extremely volatile.  It is well established in Ohio that "[c]ulpable mental states may be shown by circumstantial as well as direct evidence."  *See Kreuzer v. Kreuzer*, 2001-Ohio-1542, 144 Ohio App. 3d 610, 613, 761 N.E.2d 77, 79 (Ohio Ct. App. 2001); *accord Cleveland v. Brown*, 2012-Ohio-702 at ¶15, 2012 WL 589502 (Ohio Ct. App. Feb. 23, 2012). ("Because a defendant's mental state is difficult to demonstrate with direct evidence, it may be inferred from the surrounding circumstances in the case.")

Given the deference owed to state courts on habeas review, this Court cannot overturn a decision rejecting a sufficiency of the evidence challenge merely because it disagrees with the state court.  Given the testimony as to the highly volatile and combustible nature of methamphetamine production, there was sufficient evidence to demonstrate that Grasso acted

-35-

"knowingly," and that he was "aware that his conduct will probably cause a certain result," herein a house fire.

As such, Grasso's final ground for relief is also without merit.

## V.  Conclusion

For the foregoing reasons, it is recommended that Grasso's Petition be DENIED.

/s/ Greg White
U.S. MAGISTRATE JUDGE

Date: January 15, 2015

**OBJECTIONS**
        **Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**